IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| THE MAJESTIC STAR CASINO, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | No. 07 C 2474 |
| v. | ) | |
| | ) | Judge Robert W. Gettleman |
| TRUSTMARK INSURANCE COMPANY and | ) | |
| RMTS, LLC, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

The Majestic Star Casino, LLC ("Majestic") has brought a five count second amended complaint against Trustmark Insurance Company ("Trustmark") arising from a Trustmark policy for "stop loss" insurance coverage for Majestic employee benefit plans. Majestic asserts claims for declaratory judgment (Count I); breach of contract (Count II); unfair claims practices under Nevada Revised Statutes § 686A.310 (Count III); bad faith (Count IV); and breach of fiduciary duty (Count V). Majestic also asserts Counts I, II, and IV against RMTS LLC ("RMTS"). Trustmark subsequently filed a four count counterclaim. The parties have filed cross motions for partial summary judgment under Fed. R. Civ. P. 56.[1] For the reasons explained below, the motions are granted in part and denied in part.

---

[1]Trustmark and RMTS have jointly filed a motion for partial summary judgment and a response to Majestic's motion for partial summary judgment. For the sake of simplicity, the court will refer to these joint filings and their accompanying arguments as Trustmark's.

# FACTS[2]

Majestic operates hotels and casinos in Las Vegas, Nevada, Tunica, Mississippi, Blackhawk, Colorado, and Gary, Indiana. As part of its employee benefits packages, Majestic sponsors self-funded health benefits plans for qualifying employees and their dependents. The plans are administered by Majestic's third party administrator, Benefit Administrative Systems ("BAS").

In early January 2004, BAS received an "Illustrative Quote" (the "Quote") from RMTS, a New York Limited Liability Company, outlining several specific and aggregate stop loss coverage options with either Trustmark, an Illinois insurance company, Gerber Life Insurance Company, or New York Life Insurance Company. The Quote outlines details for three different options for both specific and aggregate coverage plans. It also provides several special conditions for each plan that include specific separate retention levels for three named Majestic employees. The Quote further lists five so-called assumptions, stating in relevant part: "This quote assumes the following: . . . 2. A minimum of 80% of all eligible employees and families are covered under the proposed plan." There is no other language relating to this 80% participation rate.

Some time after receiving the Quote, Majestic completed an application (the "2004 Application") with Trustmark for aggregate and specific stop loss insurance coverage. The 2004 Application states: "This Application must be accepted and approved by the Company [Trustmark] prior to any Contract being in effect," and then solicits various information from the

---

[2]Unless noted otherwise, the following facts, taken from the parties L.R. 56.1 statements and exhibits attached thereto, are not in dispute.

applicant. Page two of the application form includes a space for the applicant to enter the number of "[t]otal eligible employees" immediately followed by a space for the "[e]stimated initial enrollment." In its submitted 2004 Application, Majestic left the first of these two spaces blank and entered the number "1965" in the second space.

The stop loss policies were underwritten as of January 1, 2004 (the "2004 Contract"), and the applications were accepted as complete.[3] The 2004 Contract generally provides for reimbursement of eligible healthcare benefit claims paid by the plan in excess of $100,000 per year, per participant, with various exclusions and limitations, including higher deductibles for specific named employees. It includes a provision that expressly defines the "Entire Contract":

> The entire Contract between the Company and the Policyholder will consist of this Contract, the Application (including the proposal and Disclosure Statement and any other information submitted by the Policyholder required for underwriting approval), letters of understanding, any continuance requests, approved amendments, the Policyholder's Plan Document which is on file with the Company, and the Trustmark Stop Loss Administrator Application.

The 2004 Contract was renewed for a term of one year (the "2005 Contract") effective January 1, 2005. The application for renewal (the "2005 Application"), like its predecessor, includes a space for number of eligible employees that Majestic left blank upon submission to Trustmark. The renewal contract (the "2005 Contract"), however, did not include a provision defining the "Entire Contract" or separately acknowledge the assumption that 80% of eligible employees are enrolled in the plan.

In early 2006, RMTS reviewed Majestic's public filings with the Securities and Exchange Commission and found that the number of employees listed in the filings did not

---

[3]Whether RMTS acted as underwriter in its own capacity or as agent for Trustmark is unclear from the documents submitted by the parties, and in any event, is contested.

correspond with the number Majestic reported to defendants as being enrolled in its health benefits plan.  After reviewing the filings, Trustmark initiated an audit of Majestic on June 15, 2006, and stopped

 paying any pending 2005 stop loss claims until the audit was complete.  Some of these claims have yet to be paid.

After approximately eight months, in early 2007, Trustmark suspended the audit because Majestic represented that it did not have information regarding the number of employees eligible to participate in the health benefit plans and the number of employees actually participating in the plans "as of" January 1, 2004, and January 1, 2005.  Thereafter, Majestic filed the instant suit seeking reimbursement for $958,732.66 in claims that Trustmark denied under the stop loss contracts.  Trustmark has filed a four count counterclaim alleging rescission based on intentional misrepresentation (Claim I), negligent misrepresentation (Claim II), breach of contract (Claim III), and declaratory relief (Claim IV).

## DISCUSSION

*I.  Legal Standard*

Both parties have filed cross-motions for summary judgment under Fed. R. Civ. P. 56.  Summary judgment is appropriate if the evidence demonstrates that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986); Village Church v. Village of Long Grove, 468 F.3d 975, 988 (7th Cir. 2006).  The burden is on the moving party to identify portions of the pleadings, answers to interrogatories, and affidavits which demonstrate an absence of material fact.  See Celotex, 477 U.S. at 323

(1986). The burden then shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(c). When reviewing a summary judgment motion, the court must read the facts in the light most favorable to the non-moving party. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 255, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). The court's role "is not to evaluate the weight of the evidence or to determine the truth of the matter, but instead to determine whether there is a genuine issue of triable fact." <u>Doe v. R.R. Donnelley & Sons Co.</u>, 42 F.3d 439, 443 (7th Cir. 1994).

## II. *Participation Rate*

In support of its counterclaims Trustmark alleges that Majestic supplied false information about its participation percentage to Trustmark upon which Trustmark justifiably relied. Trustmark's claims are based on its assertions that Majestic knew that, (a) the policy assumed an 80% participation requirement, (b) the course of dealings between BAS and RMTS established the requirement as part of the contract, and (c) industry standards demanded such a requirement. Specifically, Trustmark argues that both the 2004 and 2005 stop loss policies are void because Majestic intentionally and negligently misrepresented that it had met the underlying 80% participation requirement that was a condition precedent to providing insurance coverage.

Majestic has moved for summary judgment on all four of Trustmark's counterclaims. Majestic contends that the 80% participation language in the 2004 stop loss Quote was merely an assumption, rather than a requirement. Majestic also argues that it never supplied any information about its participation percentage to Trustmark, including when BAS signed the Quote from RMTS, or later when Majestic signed the application it submitted to Trustmark.

5

Majestic further argues that even if there was a required participation rate, Trustmark waived this requirement when it underwrote and issued stop loss coverage without requiring disclosure of this information by Majestic.

Because the 2004 contract specifically incorporates the Quote as part of the entire contract, the assumption that 80% of eligible employees will participate in the health plan is part of the contract. Nonetheless, the parties dispute whether this assumption was waived, because Trustmark apparently disregarded Majestic's omission of the number of eligible employees when underwriting the contract. While Trustmark attempted to solicit this information from Majestic in the 2004 and 2005 applications, and in a follow-up e-mail correspondence, it ultimately failed to do so. Nonetheless, Trustmark went ahead and issued stop loss policies to Majestic in 2004 and 2005, and accepted monthly premiums from Majestic. Majestic correspondingly relied on Trustmark for coverage. Whether Trustmark actually relied on the "assumption" of an 80% participation rate is hotly contested.

In any event, Trustmark has failed to show that Majestic was guilty of misrepresentation in failing to obtain or communicate the number of eligible employees to Trustmark. Under Nevada law,[4] negligent misrepresentation is defined as:

> One who, in the course of his business, profession or employment, or in any other action in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

Barmettler v. Reno Air, Inc., 956 P.2d 1382, 1387 (Nev. 1998).

---

[4]The parties agree that the stop loss contracts are governed by Nevada state law.

Simply leaving the space for "total eligible employees" blank does not constitute a false statement or any type of misrepresentation. The application form clearly and conspicuously failed to provide this information, and Trustmark chose to ignore the omission.

Further, Trustmark has failed to produce any evidence showing that Majestic's participation rate was in fact below 80%. Trustmark cites the difference between the employee numbers entered in the applications with the numbers reported to the SEC, but as Majestic is quick to point out, the SEC numbers reflect the total number of Majestic employees rather than the number of eligible employees. Trustmark blames Majestic for not keeping accurate records and failing to provide accurate employee data for its failure to support its claims with evidence. But this issue is not relevant to Trustmark's claims based on alleged negligent misrepresentation.

Accordingly, Majestic's motion for summary judgment as to Trustmark's counterclaims of intentional and negligent misrepresentation (Claims I and II) is granted. Because of the numerous factual disputes related to the 80% participation requirement (especially whether Trustmark waived the 80% requirement), however, Majestic's motion for summary judgment as to Trustmark's counterclaims for breach of contract and rescission (Claims III and IV) is denied.

*Pending Claims*

Majestic asserts that Trustmark is acting outside of the parameters of the underlying stop loss contracts and withholding claims pending the outcome of the on-going audit.[5] It cites the language in the contract describing the rights of Trustmark in the event of an audit, and notes

---

[5]The parties dispute the amount at issue here. Majestic states that $438,168.83 in claims are being withheld, whereas Trustmark says that the withheld claims total less than $146,000.

7

that absence of a provision allowing the withholding of claims pending an on-going or stalled audit. Trustmark does not contest that the contract does not allow it to withhold claims pending an audit. It argues instead that it has been withholding funds pending resolution of the percentage participation issues in this case. Because the participation rate issues are unresolved and the breach of contract counterclaim is still pending, resolution of the pending claims is deferred.

## III. COBRA Notice

Two Majestic employees took approved leaves of absence during the course of their employment, and then went on to incur excess health care expenses for which Majestic sought stop loss reimbursement under the 2005 Policy.[6]

---

[6]It is not entirely clear whether there were two or three employees who took approved leaves of absence. Majestic claims that only two employees - Tena Daley and O'Keith Parker (the father of daughter Keila Parker) - took leave, whereas Trustmark includes at least one other employee: Stephen Bauer and/or James Gordon. The court's confusion is due to an inconsistency in Trustmark's briefs, affidavits, and supporting exhibits.

According to Majestic, Stephen Bauer did not take a leave because he was able to arrange an alternate work schedule to maintain his full-time employment status. Tena Daley took a medical leave of absence from March 19, 2005, to June 18, 2005, when she terminated her employment. BAS sent her a COBRA election notice on July 2, 2005, and she elected COBRA on July 11, 2005. O'Keith Parker took an approved leave of absence on June 29, 2005, but was back to work full time less than two months later. Because he returned to work before the 91st day of his leave, Majestic argues that COBRA was not implicated.

In addition, the parties dispute the dollar amount Trustmark denied in relation to these claims due to untimely COBRA notices. According to Majestic $208,223.80 in claims were denied, whereas Trustmark states that claims totaling $345,255.93 were excluded from stop loss coverage. These factual issues cannot and need not be decided at this time.

Trustmark denied payment on these claims on the ground that when the claimants took leaves of absence from work, the first day of leave was a COBRA qualifying event, and Majestic was obligated to provide COBRA election notices to the employees within federal deadlines. Majestic acknowledges that it did not send COBRA notices within 30 days of the first day of the employees' leave, but argues that no notice was required because the employees did not experience a qualifying event. Majestic argues that its health care plans specifically provide a 90-day extension of group health coverage for employees on an approved leave of absence, and the running of COBRA is not triggered until the 91st day.

COBRA stands for Consolidated Omnibus Budget Reconciliation Act of 1985, 29 U.S.C. § 1161, and regulates continuation of coverage for employees of, among other things, self-funded ERISA employee benefit plans. Under COBRA an employee has the option to elect continuation of health coverage during a period that begins when she would otherwise lose coverage under her employer's group health plan. 29 U.S.C. §§ 1161, 1165.

As this court summarized in Fenner v. Favorite Brand Int'l Inc., 25 F. Supp. 2d 870, 873 (N.D. Ill. 1998):

> COBRA requires the plan sponsor of each group health plan to provide each qualified beneficiary, who would lose coverage under the plan as a result of a qualifying event, an option to continue coverage under the plan. 29 U.S.C. § 1161. Upon occurrence of a qualifying event, "the employer of an employee under a plan must notify the administrator . . . within 30 days . . . of the date of the qualifying event[.]" 29 U.S.C. § 1161(a)(2). The administrator then must notify, within 14 days of receiving the notification from the employer, any qualified beneficiary of his COBRA rights. 29 U.S.C. § 1161(a)(4)(A) & (c). Any administrator who fails to meet this notification requirement "may in the court's discretion be personally liable to such participant or beneficiary in the amount of up to $100 a day from the date of such failure . . ., and the court may in its discretion order such other relief as it deems proper." 29 U.S.C. § 1132(c)(1).

For COBRA to be triggered, there must be a qualifying event – one of six listed possibilities – which, but for the continuation of coverage under COBRA, "would result in the loss of coverage of a qualified beneficiary." 29 U.S.C. § 1163. "[T]ermination . . . or reduction of hours of the covered employee's employment" is among the six possible events listed in the statute. Id. "Loss of coverage" means "to cease to be covered under the same terms and conditions as in effect immediately before the qualifying event." Collins v. Strategic Health Care Management Serv., Inc., 1992 WL 92099, at *5 (N.D. Ill., 1992). A loss of coverage can occur at any time following the qualifying event and before the end of the eighteen month maximum coverage period. Fenner, 25 F. Supp. 2d at 873. Notably, "it is the terms of the plan that matter in defining the appropriate 'trigger' [of the loss of coverage]." Id. (quoting Gaskell v. Harvard Coop. Soc'y, 3 F.3d 495, 501 (1st Cir. 1993).

Majestic's health plans state in relevant part:

If you are absent from work due to an occupation/non-occupational disability, you may continue coverage for ninety (90) days, following the date of the leave, if you pay any required contributions toward the cost of coverage. Coverage under this provision runs concurrently with coverage continued under COBRA.

The stop loss contacts at issue provide in relevant part that:

Losses under the Plan shall not include, and the Company [Trustmark] shall not be liable for, any of the following: . . . [T]his Contract shall exclude any amounts Paid for Covered Persons . . . who do not receive a valid COBRA extension offer within the 30 days immediately following a COBRA qualifying event . . . .

In Fenner, this court held that if the same medical coverage continues automatically after termination, no qualifying event occurs. 25 F. Supp. 2d at 873 (citing Mansfield v. Chicago Park Dist. Group Plan, 997 F. Supp. 1053 (N.D. Ill. 1998). But, if the health plan requires the employee to take any action to continue her coverage, and absent this action the employee's

10

coverage would lapse, then the qualifying event is termination of the employment and the employer must give the employee a COBRA notice. Id. at 874 (citing Mansfield, 997 F. Supp at 1053).

Majestic argues that Fenner and Mansfield are distinguishable. While the employee in Fenner was terminated and the employee in Mansfield retired, the employees here went on approved leaves of absence. This distinction, however, is of no moment. An approved leave of absence is within the six possible qualifying events listed under 29 U.S.C. § 1163 because it is a reduction in hours. Therefore, the holdings in Fenner and Mansfield apply here.

Majestic further argues that its health plan language reflects the company's intent to extend full coverage to employees for the first 90 days of an approved leave, and that any other interpretation would render the leave provision meaningless. While Majestic may have had every intention of extending normal health care coverage to its employees on approved leave, the language of its health plans fails to do this. The relevant provision states that an employee *may* continue coverage *if* she takes affirmative steps (paying any required contributions). Thus, continued coverage is conditional, not automatic, and if an employee does not elect to extend coverage and pay the required contributions, normal coverage will end following the date of the leave. Although Majestic's corporate director for compensation and benefits, Sally Ramirez ("Ramirez"), stated in an affidavit that employees utilizing continuation of coverage "did not have to do anything new in order to continue coverage," it is the terms of the plan that control here, not Majestic's interpretation or implementation of the plan. Majestic and Trustmark entered into the stop loss agreement based on the language of Majestic's health plan. Majestic

11

cannot avoid the delayed COBRA notice exclusion from the stop loss policy by not following its health plan's express terms.[7]

Moreover, the final sentence in the leave provision is consistent with this reading and further clarifies that the first day of leave, not the 91st day, was the triggering COBRA event. The final sentence states, "Coverage under this provision runs concurrently with coverage continued under COBRA." Use of the word "concurrently" confirms that the 18-month window for COBRA coverage begins when the leave of absence starts, not when it ends, even though the loss of coverage may not occur immediately after the beginning of the leave. Majestic argues that this last sentence, albeit poorly and, it asserts, incorrectly drafted, renders the leave provision ambiguous given the underlying intent of continuous coverage, and it urges the court to read out the word "concurrent."

The record developed during discovery provides only conflicting testimony on this point that is not particularly helpful in resolving this issue. Barbara Qualls ("Qualls") of BAS, who was Majestic's COBRA administrator at the relevant time, testified that COBRA began to run on the first day of a leave of absence under Majestic's plan, whereas Ramirez stated that it began to run on the 91st day after commencement of leave. Majestic argues that this conflict in interpretation lends weight to its contention that the provision is ambiguous. The court disagrees.

Majestic's argument is based on the flawed logic that the underlying intent of the provision trumps the plain meaning of the actual language used. If the language were ambiguous

---

[7]Indeed, RMTS put BAS on notice in 2004 that under the terms of the stop loss policy and the language of the Majestic leave provision, it considered giving COBRA notification on the 91st day of a leave of absence to be untimely.

on its face, the court would explore the intent of the parties. That Majestic and Ramirez are somehow confused about the plain meaning of the language, however, does not render it ambiguous. Absent an ambiguity, the plain language of the plan controls. Therefore, under the leave of absence provision of Majestic's health plan, the qualifying event for purposes of COBRA was the first day of leave, and the COBRA notice clock began to run on that day. Accordingly, since Majestic failed to send COBRA notices until after the 91st day of leave, it was in breach of the delayed COBRA notice exclusion of the stop loss contract. Consequently, Trustmark's motion for partial summary judgment on the limited issue of liability under the COBRA exclusion is granted and Majestic's motion is denied.

*IV. Dismissal of RMTS as a party to this suit*

Majestic has included RMTS as a defendant in Count I (declaratory relief), Count II (breach of contract), and Count IV (bad faith). RMTS argues that it should be "dismissed" from this action because it was not a party to the stop loss contracts.[8] Majestic counters that RMTS is a proper defendant because it is a party to the contract, or alternatively, because it was engaged in a joint venture with Trustmark.

The stop loss contract defines "the Parties to this Contract" as simply: "the Policyholder [Majestic] and the Company [Trustmark]." RMTS is not listed as a party to the contract, nor mentioned anywhere else in the body of the contract. Nonetheless, Majestic argues that RMTS is a properly named defendant because it extended stop loss coverage to Majestic five months

---

[8]Rather than seeking "dismissal" in the sense of a Rule 12(b) motion, defendants have brought this argument as part of their motion for partial summary judgment, and it will be treated as such by the court.

before Trustmark approved or issued the underlying policy. Majestic argues that for those interim five months RMTS was the insurer and potentially liable for the entire contract if Trustmark refused to approve the policy. Although it is true that Trustmark was not immediately bound to the policy terms offered in the Quote upon Majestic's acceptance, Majestic's reasoning ignores the clear language of the Quote:

> Subject to final approval by the New York based underwriting department of RMTS Associates LLC, RMTS, is pleased to offer your client Specific and Aggregate stop loss coverage with either Trustmark Insurance Company or Gerber Life Insurance Company under the following terms and conditions, . . .

Thus, RMTS appeared to be expressly acting as an agent on behalf of a principal – one of the two identified insurance companies – that would provide stop loss coverage as of January 1, 2004. RMTS does not appear to have committed to writing the insurance itself; it committed only to approve and procure insurance to cover the entire period. Even if Trustmark had hypothetically declined to ultimately issue the policy, RMTS's underwriter testified that RMTS would have placed the policy with another insurance carrier, and that there had never been a case where a policy was left without a carrier. Therefore, Majestic has failed to establish that the uncontested facts demonstrate that RMTS issued any insurance coverage to Majestic.

In support of its joint venture theory of liability, Majestic relies on Nevada law on joint ventures to support its argument. But Nevada law is inapplicable here. Although the stop loss contracts are governed by the laws of the state of Nevada, RMTS is not a party to the contracts, and the contracts' choice of law provisions do not apply to Majestic's claims against RMTS. Instead, since jurisdiction here is based on diversity, the court must apply the choice-of-law rules of Illinois, the forum state. Smurfit Newsprint Corp. v. Southeast Paper Mfg. Co., 368 F.3d 944, 949 (7th Cir. 2004).

14

"Ordinarily, Illinois follows the Restatement (Second) of Conflict of Laws (1971) in making choice-of-law decisions." Morris B. Chapman and Assocs v. Kitzman, 193 Ill.2d 560, 568 (2000) (using Restatement (Second) Conflict of Laws §§ 6 and 221). Under § 221 of the Restatement, the court applies the law of the forum that has the most significant relationship to the parties and the occurrence. According to the Restatement, the following factors may be considered according to their importance with respect to the issue before the court:

> (a) the place where the relationship between the parties was centered, provided that the receipt of the enrichment was substantially related to the relationship;
>
> (b) the place where the benefit or enrichment was done;
>
> (c) the place where the act conferring the benefit or enrichment was done;
>
> (d) the domicile, residence, nationality, place of incorporation and place of business of the parties; and
>
> (e) the place where the physical thing, such as the land or chattel, which was substantially related to the enrichment, was situated at the time of the enrichment.

It is uncontested that RMTS is a New York LLC, its members are all citizens of New York, and its principal office is in New York City. Similarly uncontested are the facts that Trustmark is an Illinois corporation with its principal offices in Lake Forest, Illinois.

In both New York and Illinois, the core definition of a joint venture is an association of two or more persons to carry out a single business enterprise for profit. Kaufman v. Torkan, 51 A.D.3d 977, 979, 859 N.Y.S.2d 253, 2008 N.Y. Slip Op. 04838 (N.Y.A.D. 2d Dept, May 27, 2008); Barton v. Evanston Hosp., 159 Ill. App. 3d 970, 973 (Ill. App. Ct. 1st Dist. 1987). In New York, the elements of a joint venture are "an agreement manifesting the intent of the parties to be associated as joint venturers, a contribution by the coventurers to the joint undertaking (i.e., a combination of property, financial resources, effort, skill or knowledge), some degree of joint

proprietorship and control over the enterprise; and a provision for the sharing of profits and losses." Kaufman, 51 A.D.3d at 979. In Illinois, the elements of a joint venture are: (1) a community of interest in the purpose of the joint venture; (2) a right to direct and govern the policy and the conduct of other joint venturers; (3) the right to joint control of the property used in the joint venture; and (4) a sharing in both profits and losses. Barton v. Evanston Hosp., 159 Ill. App. 3d 970, 974 (1987) (noting that mutual control is possibly the most important factor).

Needless to say, a joint venture analysis under either states' law is factually intensive. In the instant case, the parties have failed to provide the court with all of the facts necessary to complete this analysis, and many of the facts that have been supplied are contested. Because there are questions of material fact regarding the type of relationship that existed between RMTS and Trustmark relating to the stop loss policies, resolution of this matter on a motion for summary judgment is inappropriate. Consequently, Trustmark's motion for summary judgment on this issue is denied.

*V. Claims for Which Issues of Material Fact Preclude Summary Judgment*

There are genuine issues of material fact that preclude summary judgment on four issues raised by Trustmark and one claim advanced by Majestic. First, Trustmark argues that claims totaling $812,842.33 are ineligible for reimbursement because Majestic did not pay the claims within the designated benefit period. Although the stop loss policy defines numerous terms relevant to the timing of Majestic's payment of certain claims, including the word "paid," the policy does not supply a definition of the word "issue" – as in to "issue" a check – nor do the parties agree to a definition. Trustmark appears to contend that the checks are "issued" on the

16

date they were printed.  Majestic contends the checks were "issued" on the date they were mailed to recipients.  The record is unclear which, if either, definition should be applied.  Without an agreed definition, it is impossible to ascertain the timeliness of payments using the data submitted, because the outcome hinges on the "date of issue" of numerous checks.  Further, it is a question of fact whether Trustmark waived this specific argument because it waited four years to raise it as a justification for not paying the claims.  Therefore, summary judgment as to these claims is denied.

Second, Trustmark argues that claims totaling $75,506.62 are ineligible for reimbursement because Majestic paid these claims more than 365 days after the services were incurred.  Because resolution of this issue depends on the definition of the word "issue," summary judgment as to these claims is also denied.

Third, Trustmark argues that claims totaling $37,838.04 are ineligible for reimbursement because they were submitted to Trustmark more than 90 days after the benefit period.  Majestic disputes the veracity of the dates indicated on certain submission forms accompanying the pertinent claims.  It contends that these dates have been altered or forged so that the true submission dates are unclear.  Because the contested submission dates are material here, summary judgment is also denied as to this issue.

Fourth, Trustmark argues that two Majestic stop loss claims totaling $49,903.83 exceed the reasonable and customary charge limits set out in the policy.  Trustmark's argument relies on a comparison of Majestic's claims with data from the Health Insurance Association of America database, a source that provides data on charges made by medical providers by service and geographic area, and CorVel, a third party vendor.  Majestic disputes the facts underlying this

17

issue and contests the admissibility of the evidence upon which Trustmark relies. Because resolution of this issue requires findings of contested material fact, summary judgment is denied.

Finally, Majestic has moved for summary judgment on claims totaling $101,622.68 related to beneficiary James Gordon ("Gordon"). The parties dispute the reasons why Trustmark denied these claims, but the briefs and supporting exhibits are abbreviated and conflicting. Because the issue is so poorly briefed by both parties and there appear to be genuine issues of material fact, the court denies Majestic's motion for summary judgment on the Gordon claims.

## *VI. Subrogated and Miscalculated Claims*

Trustmark argues that a claim for $12,641.26 (relating to plan beneficiary Ramona Boyer) should be excluded in the total amount disputed because Majestic has recovered these funds from a third-party via subrogation. It also argues that a claim for $5,905.08 (relating to plan beneficiary Keila Parker) should be excluded from recovery because of a mathematical error in computing the amount of requested reimbursement. Majestic offers no arguments or facts to contest these assertions. Therefore, summary judgment is granted in favor of Trustmark as to these limited claims.

## *VII. Fiduciary Duty*

Trustmark seeks summary judgment on Count V of the complaint, arguing that breach of fiduciary duty is not a cause of action under Nevada law. Under Nevada law, "an insurer's duty to its policyholder is 'akin' to a fiduciary relationship," but this does not create a new cause of action. Evanston Ins. Co. v. Robb Techs., 2006 WL 1891134, *3 (D. Nev. July 7, 2006)

(dismissing a policyholder's claim against an insurer for breach of fiduciary duty for failure to state a claim).  Because Nevada law does not recognize a claim based on a breach of fiduciary duty between Trustmark and Majestic, Count V fails to state a claim upon which relief can be granted.  Therefore, Trustmark's motion for summary judgment on Count V is granted.

*VII. Parker Claim*

Majestic argues that Trustmark's denial of $22,466.08 from a claim it made in 2005 for plan beneficiary Keila Parker ("Parker") is invalid.  Majestic states that the claim was denied because Parker was given a private rather than a shared room during treatment for her condition.  Trustmark denies that this was the reason the Parker claim was denied, and instead points to three spreadsheets attached to an affidavit accompanying its brief in opposition to the instant motions.  Aside from being an irritating way to present an argument (by relying on exhibits, without explaining the significance of the exhibits in its brief), if Trustmark's "argument" is understood correctly, it implies that various portions of the Parker claim were denied because they were not paid within the benefit period, there was a mathematical error somewhere in the claim, and because COBRA was not offered in a timely manner.  The court has addressed and resolved these underlying legal issues elsewhere in this opinion.  The outstanding factual issues that are material to this claim, specifically the amount of corresponding money, is left to the finder of fact.  Therefore, Majestic's motion for summary judgment on the Parker claim is denied.

## **CONCLUSION**

For the reasons stated above, Majestic's motion for summary judgment is granted as to Claims I and II of Trustmark's counterclaim (alleging intentional and negligent misrepresentation) and denied as to Claims III and IV (alleging breach of contract and rescission). Resolution of the issue of pending claims is deferred. Trustmark's motion for summary judgment on the limited issue of liability under the COBRA exclusion is granted and Majestic's motion on this issue is denied. Trustmark's motion for summary judgment as to RMTS's liability for Counts I, II and IV is denied. Trustmark's motion for summary judgment on claims that Majestic allegedly, (a) did not pay within the designated benefit period, (b) paid more than 365 days after services were incurred, and (c) submitted to Trustmark more than 90 days after the benefit period is denied. Similarly, Trustmark's motion for summary judgment on two claims that allegedly exceed the reasonable and customary charge limits of the policy is denied. Majestic's motion for summary judgment on the James Gordon claim is denied. Trustmark's motion for summary judgment on Count V (breach of fiduciary duty), the claim for $12,641.26 in subrogated funds related to plan beneficiary Ramona Boyer, and the claim for $5,905.08 related to plan beneficiary Keila Parker is granted. Majestic's motion for summary judgment on the remainder of the Keila Parker claim is denied.

This matter is set for a report on status October 20, 2009, at 9:00 a.m.

**ENTER:     October 8, 2009**

_____
**Robert W. Gettleman
United States District Judge**